## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No.: 25-cv-2223**

THE ESTATE OF DANIEL FOARD,
by and through its co-personal representatives JIM FOARD and SUSAN GIZINSKI;
JIM FOARD, individually;
SUSAN GIZINSKI, individually;

      Plaintiffs,

v.

SOUTHERN HEALTH PARTNERS, INC.;
THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF LA PLATA,
COLORADO;
SHERIFF SEAN SMITH, in his official capacity;
SIERRA SNOOKS, individually;
ASHLEY BOX, individually;
RANDALL CLARK, individually;
AMANDA DODGE, individually;
PATRICK SCALES, individually;
RYAN DAVIS, individually;
COURTNEY KELLINGER, individually;
VICTOR LOPEZ, individually;

      Defendants.

---

### COMPLAINT AND JURY DEMAND

---

Plaintiffs, by and through their attorneys at HOLLAND, HOLLAND EDWARDS & GROSSMAN,

LLC, complain against Defendants and request a trial by jury as follows:

### I.  <u>INTRODUCTION</u>

1. Daniel Foard died a gruesome and entirely preventable death while incarcerated in

the La Plata County Jail, while deputies and nurses watched.

2. Mr. Foard was incarcerated in La Plata County Jail and went through withdrawal for opiates.

3. After progressing in the withdrawal protocols, he was moved to general population. Thereafter, he developed weakness, persistent 10 out of 10 abdominal pain, and persistent copious vomiting, including vomiting blood.

4. He was housed in "medical monitoring" where nurses did not check on him, and deputies and sergeants simply watched as he vomited so much that he had to repeatedly move cells because they were covered in vomit.

5. Even as he threw up bloody vomit, staff just told him to try to aim the vomit into the drain, so it didn't make such a mess.

6. None of the individual defendants tried to help him or obtain medical care. They refused to call an ambulance or take Mr. Foard to a hospital that was only minutes away.

7. No one even took his vital signs as he vomited his way through cell after cell.

8. The La Plata County jail contracts with Southern Health Partners to provide medical care in the jail, and they jointly drastically understaffed the medical department.

9. Southern Health Partners Nurses were allowed to diagnose recklessly outside of their licensure, and no doctor was called or involved as Mr. Foard deteriorated to death.

10. Medically untrained deputies conducted "medical monitoring," without any actual assessment other than whether he was still alive.

11. Even as Mr. Foard yelled out to go to the hospital, repeatedly begging for help, he was ignored.

12. After two days of being denied medical treatment, Mr. Foard died on the floor of

2

his cell at the age of 32 from a treatable duodenal ulcer that finally perforated.

## II.  JURISDICTION AND VENUE

13.     This action arises under the Constitution and laws of the United States, including Article III, Section 1 of the United States Constitution, and 42 U.S.C. § 1983 and 42 U.S.C. § 1988.  The Jurisdiction of this Court is further invoked pursuant to 28 U.S.C. §§ 1331, 1343, 2201.

14.     This case is instituted in the United States District Court for the District of Colorado pursuant to 28 U.S.C. §1391 as the judicial district in which all relevant events and omissions occurred, and in which Defendants maintain offices and/or reside.

15.     Supplemental pendent jurisdiction is based on 28 U.S.C. §1367 because the violations of federal law alleged are substantial and the pendent causes of action under state law derive from a common nucleus of operative facts.

## III.  PARTIES

16.     At all times pertinent hereto, the decedent, Daniel Foard, was a resident of the State of Colorado and a citizen of the United States of America and was incarcerated as a pre-trial detainee at the La Plata County Jail.

17.     Plaintiff Estate of Daniel Foard is opened in La Plata County Colorado.

18.     Plaintiff Jim Foard is the father of decedent and co-Personal Representative of the Estate of Daniel Foard.

19.     Plaintiff Susan Gizinski is the mother of decedent and the co-Personal Representative the Estate of Daniel Foard.

20.     At all times relevant hereto, Plaintiffs Jim Foard and Susan Gizinski were residents of the State of Maryland and citizens of the United States of America. Plaintiffs Jim Foard and

3

Susan Gizinski also sue individually.

21.     Defendant Board of County Commissioners of the County of La Plata Colorado, a/k/a "BOCC" is a governmental entity chartered under the laws of the State of Colorado. Among other things, La Plata County, through the La Plata County Sheriff's Office ("Sheriff"), operates the La Plata County Jail ("LPCJ" or "the Jail"), located at 742 Turner Dr., Durango, CO 81301.

22.     Defendant BOCC represents, oversees, and sets policy for La Plata County Colorado. The BOCC also contracted with Defendant Southern Health Partners, Inc. to provide health care to detainees and inmates at the La Plata County Jail.

23.     Defendant Sheriff Sean Smith, in his official capacity, is the La Plata County Sheriff and is a final policy maker for La Plata County with respect to all matters concerning the Sheriff's Office and all of its divisions, including the La Plata County Jail.

24.     The La Plata County Sheriff and the BOCC are collectively referred to herein as "La Plata County," or "the County."

25.     The La Plata County Defendants are sued under 42 U.S.C. § 1983 for their own deliberately indifferent policies and practices with respect to the provision of medical care and treatment for inmates. They are also properly sued for the deliberately indifferent policies and practices of Defendant Southern Health Partners, Inc. Although the County has sought to privatize the provision of healthcare services, it has a non-delegable duty to provide constitutionally adequate care, cannot contract away its constitutional obligation, and is legally liable for the challenged deliberately indifferent policies and practices as moving forces in the deliberately indifferent medical care and treatment of persons detained in the jail, including Daniel Foard, by its contractors, their agents and employees including the named individual caregivers.

4

26.     Defendant Southern Health Partners, Inc. ("SHP"), is a private Delaware correctional healthcare corporation doing business in this judicial district for the purpose of making a profit. Defendant SHP is headquartered in Tennessee, with a principal address of 2030 Hamilton Place Blvd., Ste. 140, Chattanooga, TN 37421. Its registered agent of service in Colorado is the Corporation Service Company, 1900 W. Littleton Blvd., Littleton, CO 80120.

27.     Defendant Southern Health Partners, Inc. is a proper entity to be sued under 42 U.S.C. § 1983 for its deliberately indifferent policies, practices, habits, customs, procedures, training and supervision of staff with respect to the provision of medical care and treatment for inmates at the La Plata County Jail. Since June of 2016, Defendant SHP has contracted with La Plata County to provide medical services to LPCJ's detainees and inmates and supervises and implements such care. SHP is a "person" under 42 U.S.C. § 1983. At all relevant times hereto, SHP acted under color of state law and pursuant to a contract with La Plata County to provide necessary medical care to detainees and inmates in the La Plata County Jail. SHP was responsible for ensuring that the care and staffing it provided met minimum constitutional standards and for training and supervising its jail healthcare staff to meet those standards.

28.     La Plata County Defendants and Defendant SHP are hereafter at times collectively referred to herein as the "Entity Defendants."

29.     At all times relevant hereto, Defendant RN Sierra Snooks was a citizen of the United States and a resident of Colorado. Defendant Snooks was an agent, employee, and/or subcontractor of Defendant SHP and was responsible for providing medical care to Daniel Foard during his detention. At all material times, this Defendant acted under color of state law.

30.     At all times relevant hereto, Defendant RN Ashley Box was a citizen of the United

States and a resident of Colorado. Defendant Box was an agent, employee, and/or subcontractor of Defendant SHP and was responsible for providing medical care to Daniel Foard during his detention. At all material times, this Defendant acted under color of state law.

31.    Defendants Snooks and Box are referred to at times as the "Individual Nurse Defendants."

32.    At all times relevant hereto, Defendant Victor Lopez, MD was a citizen of the United States and a resident of Colorado. Defendant Lopez, as the Medical Director at LPCJ, was an agent, employee, and/or subcontractor of Defendant SHP and was responsible for providing medical care to Daniel Foard during his detention. At all material times, this Defendant acted under color of state law.

33.    At all times relevant hereto, Defendant Randall Clark was a citizen of the United States and a resident of Colorado, working as a POST-certified employee of the La Plata County Sheriff's Office as a jail Sergeant at the La Plata County Jail. At all material times, this Defendant acted within the scope and course of his employment and under color of state law.

34.    At all times relevant hereto, Defendant Amanda Dodge was a citizen of the United States and a resident of Colorado, working as a POST-certified employee of the La Plata County Sheriff's Office as a Deputy at the La Plata County Jail. At all material times, this Defendant acted within the scope and course of her employment and under color of state law.

35.    At all times relevant hereto, Defendant Patrick Scales was a citizen of the United States and a resident of Colorado, working as POST-certified employee of the La Plata County Sheriff's Office as a Deputy at the La Plata County Jail. At all material times, this Defendant acted within the scope and course of his employment and under color of state law.

6

36.     At all times relevant hereto, Defendant Ryan Davis was a citizen of the United States and a resident of Colorado, working as POST-certified employee of the La Plata County Sheriff's Office as a jail Sergeant at the La Plata County Jail. At all material times, this Defendant acted within the scope and course of his employment and under color of state law.

37.     At all times relevant hereto, Defendant Courtney Kellinger was a citizen of the United States and a resident of Colorado, working as POST-certified employee of the La Plata County Sheriff's Office as a Deputy at the La Plata County Jail. At all material times, this Defendant acted within the scope and course of her employment and under color of state law.

38.     Defendants Clark, Dodge, Scales, Davis, and Kellinger are referred to at times as the "Individual County Defendants."

## IV.  STATEMENT OF FACTS

39.     Daniel Foard was incarcerated at the La Plata County Jail ("LPCJ" or "the Jail") on August 11, 2023.

40.     He died several days later from a perforated duodenal ulcer, after enduring more than fifteen hours of unrelenting and excruciating pain.

41.     A duodenal ulcer is a particular kind of peptic ulcer, located in the upper part of the small intestine or duodenum.

42.     If left untreated, these ulcers can cause severe internal bleeding, an obstruction of the digestive tract, or a perforation. A perforation is an ulcer which effectively eats a hole through the wall of a person's stomach or duodenum.

43.     Symptoms of an ulcer include burning stomach, abdominal, back, or flank pain, fainting or feelings of faintness, and nausea or vomiting, among others.

44.    Patients who are medically evaluated and receive timely treatment for an ulcer likely go on to lead normal lives, with little or no lasting impairment or loss in quality of life.

45.    Bleeding from the ulcer and/or perforation can cause a person to vomit blood.

46.    Vomiting blood is an obvious medical emergency, to the medically trained and laypersons alike, requiring an immediate evaluation by a doctor or hospital who can diagnose the cause and treat it.

47.    Vomiting continuously all day is an obvious medical emergency, as all nurses and lay people know that it can pose a serious risk of death from dehydration.

48.    Regardless of the cause of vomiting, all individual defendants knew at the time of Mr. Foard's incarceration, that an inmate is at serious risk from persistent vomiting and needs urgent medical intervention.

49.    Sudden and severe persisting undiagnosed abdominal pain like Mr. Foard's, which was 10 out of 10, is not just a serious medical need but an obviously serious medical emergency to medical and lay persons alike. It is a very clear warning sign that an ulcer is at serious danger of perforating.  This acute and severe pain and emergency can manifest itself in several ways that are obvious to the medically trained and to laypersons alike, because they include, as here, audible moaning and groaning, abnormally heavy sweating, bloody vomit, and readily observable changes in breathing patterns such as short, rapid, and labored breathing.

50.    A perforated duodenal ulcer is also unquestionably an emergency medical condition; leaking of gastric juice and gas into the abdominal cavity causes infection of the abdominal lining, sepsis, and death.

51.    All reasonably trained health care workers understand that signs and symptoms of

8

such serious illnesses must be timely worked up and evaluated by a doctor to prevent or timely treat a perforation, because of the danger of sepsis and death associated with a perforated ulcer.

52.     All reasonably trained health care workers understand that a bleeding or perforated ulcer is a medical emergency requiring immediate medical attention, workup by a physician including a skilled abdominal exam, and often further testing or treatment by endoscopy, X-ray, or emergency surgery.

53.     All reasonably trained nurses understand that they lack the qualifications and training to diagnose the cause of a person's symptoms and instead are only allowed by licensure to ascertain abnormal results and relay abnormal results and subjective complaints to providers capable of diagnoses. Diagnosing the cause of a symptom, or ruling out a serious cause, is recklessly outside the scope of practice of a nurse and is obviously dangerous to the patient.

54.     All reasonably trained nurses understand that they lack the skills, qualifications and training to diagnose ulcers and other potentially fatal stomach illnesses, and that they cannot diagnose the cause of a patient's severe and persistent 10/10 abdominal pain, fainting or feelings of faintness, and persistent nausea and vomiting, including vomiting with blood.

55.     All reasonably trained nurses understand that they are gatekeepers to an inmate's higher acuity medical care, and that such serious symptoms require immediate transfer to a medical facility, where the cause of such a dire constellation of symptoms can be diagnosed and treated.

56.     All reasonably trained security staff understand that they are lay persons with respect to the practice of medicine, and that they lack the medical training, education, skills and licensure necessary to be entrusted to monitor, evaluate, treat, or diagnose the cause of an inmate's severe and persistent abdominal pain, fainting, and persistent nausea and vomiting, including

9

bloody vomit. All reasonably trained security staff understand that they are gatekeepers to an inmate's medical care, and that such symptoms require immediate transfer to a higher acuity medical facility where the cause of such a dire constellation of symptoms can be diagnosed and treated. Being untrained, it is imperative that security staff err on the side of early intervention.

57. Daniel Foard was booked into LPCJ on August 11, 2023.

58. At all times relevant hereto, La Plata County contracted with Southern Health Partners, Inc. ("SHP") to provide medical care at LPCJ.

59. During the booking process, Mr. Foard told SHP nursing staff that he regularly took fentanyl pills. He was put on detoxification monitoring and housed on "medical observation" in the Jail's booking area to facilitate closer monitoring until he cleared the withdrawal protocol.

60. Mr. Foard's time in SHP's detoxification program was largely uneventful. He had some vomiting and diarrhea and slept a great deal, occasionally coming out of his cell for the regular body scans that were part of this program.

61. Mr. Foard's vomiting, nausea and diarrhea abated, although his vitals continued to be abnormal, with fast heart rates, fast respirations, and high blood pressures.

62. None of these vital signs were relayed to a provider by Defendant Nurses Snooks and Box.

63. Around 9:45 p.m. the night of August 15, during a routine body scan before he was moved to general population housing, Mr. Foard collapsed to the floor a number of times.

64. While Mr. Foard was on the ground, light-headed and unable to stay standing, Defendant Sgt. Randall Clark mouthed to Deputy Wiseman that he thought Foard was "faking."

65. Nurse Box told Mr. Foard he was falling because he was dehydrated. Despite

stating that Mr. Foard was slumping and falling to the ground from dehydration, Nurse Box repeatedly charted in his medical record that she had no concern of dehydration.

66.     It is the policy of SHP and the County that inmates must stay in booking on detoxification checks until they are stable. Once a detoxing inmate has been determined to be stable by the medical staff, the inmate can be moved to general housing.

67.     Late on August 15, Nurse Box concluded that Mr. Foard's detoxification-related symptoms were stable, and that he no longer needed to be on medical observation for detoxification. Based on her decision, Mr. Foard was moved from booking to a general population cell in LPCJ's G Block.

68.     However, even on the short way to G Block, the escorting Deputy, Defendant Amanda Dodge, observed that Mr. Foard was very unsteady on his feet and out of breath, describing him as "just very unbalanced. He was short of breath and it was crazy. He was just staggering. It was hard for him even to walk."

69.     After escorting Mr. Foard to G Block, Deputy Dodge told RN Box that he was "really struggling." Nurse Box responded by asking Deputy Dodge, who was not licensed or trained to evaluate an inmate's medical condition, "what do you think?"

70.     RN Box chose to rely on a medically untrained Deputy to tell her how her patient was doing, but then disregarded what she reported.

71.     Thus, RN Box did not go to see Mr. Foard in G Block in response to these alarming symptoms.  She did not relay this significant change of condition to a doctor.

72.     Mr. Foard was kept in his G Block cell until sometime around 6:00 a.m. on August 16, 2023.

11

73.    Over the course of the night, he vomited repeatedly and continually complained of stomach pain.  He called Deputies from the cell's call box several times, telling them that he was sick, his stomach was hurting, and that he wanted to be seen by medical. No Deputy or SHP medical staff responded.

74.    Mr. Foard had a cellmate named Christopher Tindall in the G Block cell. Mr. Tindall heard Foard complaining of stomach pain and saw him vomit three times. Tindall also observed Foard calling deputies from the cell and from the call box to tell them that he was sick and wanted to see medical.

75.    Shortly after 6:30 a.m. on August 16, Deputy Krysten Garcia was serving breakfast trays in G-Block when she saw Mr. Foard approach the cell window, steady at first but then swaying and falling forward headfirst into the window, dropping his cup to the floor.

76.    Deputy Garcia saw Mr. Foard fall forward into the window a second time when he tried to pick up the cup he had just dropped.

77.    Deputy Garcia asked Mr. Foard to step out of the cell so he could be seen by medical. As he did so, Garcia observed Foard take only a few steps before he again had to sit down on the floor, because he obviously could not safely ambulate, stand, or maintain balance.

78.    While Deputy Garcia and Mr. Foard waited for the lone SHP nurse to come to G Block, Foard told Garcia that he was thirsty and had stomach pain.

79.    Defendant RN Snooks arrived, together with a Nurse trainee, and cursorily assessed Mr. Foard.

80.    According to RN Snooks' charting, Foard was sitting on the floor and appeared to be breathing heavy when she arrived in G-Block.

12

81.     RN Snooks learned from Deputy Garcia that he had fallen down repeatedly while getting his breakfast tray.

82.     She charted that Mr. Foard reported intense abdominal pain -- a "sharp" "shooting" pain that was a "10", on a 1-10 scale.

83.     Deputy Garcia escorted Foard to medical where RN Snooks purported to do a brief limited-area abdominal assessment. She did not ask him details of his pain or take any history of his symptoms.

84.     Defendant Snooks knew that Mr. Foard had been light-headed and had reported a series of falls. She knew that the night deputy reported that he was struggling, staggering, and did not look good. Mr. Foard had obviously labored breathing and new bouts of severe vomiting.

85.     Mr. Foard told her that this did not feel like normal withdrawal symptoms.

86.     And in fact, as RN Snooks knew, sudden, sharp, acute abdominal pain is not a symptom of withdrawal.

87.     RN Snooks told Foard that she was initially concerned about appendicitis, but that she had decided that the pain wasn't in the right place to be appendicitis, so they would just "monitor" him in the booking area.

88.     RNs are prohibited by licensure from diagnosing or ruling out appendicitis. A nursing concern about an appendicitis (or any other such unexplained severe abdominal pain and vomiting) required Defendant Snooks to call the doctor. 10-out-of-10 sharp, shooting, and persisting abdominal pain is unquestionably a serious medical emergency. These symptoms mandate immediate provider involvement.

89.     RN Snooks did not call her supervising doctor or send Mr. Foard to the nearby

13

hospital to get him a medical diagnosis and treatment commensurate with his emergency symptoms.

90.    Rather, Defendant Snooks assigned Mr. Foard for "medical monitoring," but then conducted no medical monitoring at all. She did not, in fact, monitor Mr. Foard more closely.

91.    RN Snooks did not even communicate with any of the Deputies why Mr. Foard was being moved back to be monitored. She did not ask for any specific observations. She did not order or vitals or follow up herself at any point. Nor did anyone else from SHP's medical staff. The next time a nurse came to see him he was dead.

92.    The custom and practice of "Medical monitoring" at LPCJ did not consist of any actual monitoring but instead operated as a system of warehousing people with medical complaints, with reckless disregard for the seriousness of the complaints and need for medical intervention.

**Mr. Foard was Desperately Ill and in Excruciating Pain for More Than 15 Hours**

93.    Deputy Patrick Scales escorted Foard back to booking, Holding Cell 4 ("HC4"), around 7:00 a.m. on August 16, 2023, where he was placed "so that all booking stations could easily see him."

94.    Between roughly 7:00 a.m. and when the night shift came on around 6:00 p.m., Mr. Foard vomited all day.

95.    By the time night shift came on at 6:00 p.m., Mr. Foard had been moved to Holding Cell 5 ("HC5") because the cell he was in (HC4) was so filthy with vomit.

96.    Nurse Snooks then left the building after deciding to warehouse Foard in a holding cell without telling Deputies why he was there, without taking any vital signs all day, and having

14

utterly failed to medically monitor a man who was vomiting profusely all day, who was unable to stand that morning, and who had reported to her his agonizing 10-out-of-10 abdominal pain.

97. Nurse Box came back on shift at 6:00 p.m. the evening of August 16, 2023.

98. By 6:40 p.m. on August 16, Mr. Foard had been moved again, this time to Holding Cell 6 ("HC6"), because of his persistent and prodigious vomiting.

99. Nurse Box learned, from being "passed on" by the previous shift's Nurse Snooks, that Mr. Foard had actually been seen pouring his soup into the toilet, drinking the toilet water/soup mixture, and then immediately vomiting it back up into the toilet.

100. Nurse Box knew that profuse vomiting alone can kill a person if it persists. And she knew that the cause of Mr. Foard's persistent all-day vomiting and extreme pain was unknown. Nurse Box also knew that sudden, sharp, acute abdominal pain is not a symptom of withdrawal.

101. Nurse Box also knew that Foard had been yelling for medical care and she herself could hear him yelling out to her to come see him, but chose not to.

102. Mr. Foard died in HC6 hours later.

103. HC6, which like cells HC4 and HC5 was located only feet from the booking Deputies' "elevated control and viewing area," is illustrated below (Mr. Foard's dead body was redacted in this CBI photo):



104.    HC6 was equipped with surveillance cameras with video and audio capability.

105.    When he was first moved to HC6, Mr. Foard had to crawl to get there and immediately collapsed on the floor, as shown below:



106.    Standing by to supervise this disturbing and worsening medical crisis, as illustrated in the screen shot above, was Defendant Sgt. Clark.

107.    Sgt. Clark and Deputy Dodge were monitoring the HC6 video of Mr. Foard from Sgt. Clark's office.

108.    Having collapsed to the floor in HC6, Mr. Foard's excruciating pre-mortem suffering was permitted to continue unabated for hours.

109.    He loudly and repeatedly retched, grunted, and groaned in agony.

110.    Obviously in acute distress, he spit, vomited, and repeatedly yelled out for help.

111.    He kept begging for Gatorade or Powerade or water.

112.    He yelled out that he "can't poop or pee!" and rambled on in obvious pain about salt, electrolytes, the Nurse, and his diet.

16

113.    He called out for a "Nurse," and continuously called out "Help!"

114.    Mr. Foard was in obvious distress, holding his head in his hands, heavily and loudly and rapidly breathing.

115.    He yelled out: "I need to go to the hospital!"

116.    All of this was heard by the individual Deputy and Sergeant Defendants and any other inmate, nurse, or staff nearby.

117.    Mr. Foard was vomiting and spitting up coffee-ground emesis and bloody vomit, an unquestionably very serious sign of an obvious medical emergency to lay and to medical staff alike, requiring an immediate send-out from a Jail that was not remotely equipped to handle it, in equipment or licensed medical providers.

118.    This can be partially seen in the photos below:

 



119.    Instead of reacting to the obvious medical emergency right in front of him, Defendant Clark outrageously told Mr. Foard to "try to hit that drain" with his vomit, because they "can't keep switching you out to clean."

120.    Mr. Foard tried to follow Sgt. Clark's instructions, cleaning some of his own bloody vomit by pushing it with one hand toward the floor drain.

121.    On one occasion he was given a cup of water, and between labored breaths loudly yelled out "Oh my God!" and that he was "vomiting blood."

122.    Defendant Sgt. Clark, who is seen looking into the cell window when Mr. Foard yelled out about the blood, callously responded: "Ready for your mat?"

123.    Sgt. Clark then opened the cell door to take away Mr. Foard's soiled blanket and replace it with a mat. He could easily see the visible blood in the vomit spread on the floor:



124.    Booking Deputies left the food tray slot of HC6 open, which meant that everyone in the booking area could hear Mr. Foard, not just on the video but live from their "elevated viewing and control" area. They all could thus personally see and hear Mr. Foard vomiting, moaning, retching, grunting and groaning, begging for help, for water, for electrolytes and asking to go the hospital during his last hours.

125.    Mr. Foard fully experienced knowing he was going to die.

126.    Individual County Defendants heard and saw Mr. Foard's agony given their close proximity to all his cells in booking that day – HC4, HC5, and HC6 – illustrated by the screenshot below taken from CBI's post-death investigation:



19

127.    These Defendants sometimes responded verbally to Mr. Foard in his agony. For example, after one of Mr. Foard's many calls for help, a Deputy Defendant responded: "What do ya need?" Foard yelled back about his needs as follows: "I'm in a lot of pain…. I'm gonna die!"

128.    At around 7:30 p.m., an individual Defendant, believed to be Sgt. Clark, told Mr. Foard: "I don't know if you can comprehend what I'm saying…I'm gonna get you some water but I can't just jump every time…if you keep yellin' **I hear you** but there's not a whole lot I can do…." (emphasis added).

129.    Nurses could also hear the same yelling and pleading when they were in the area and as they did their "walk-bys" of his cell.

130.    Nurse Box was told by deputies that Mr. Foard was vomiting continuously, that he had to be moved because of soiled cells, that he was drinking toilet water and vomiting it back up, and she knew that he was yelling for her and could hear him yelling, but instead of going to see him, she merely did walk byes of his cell, glancing in but not taking vitals, talking to him, assessing him or doing anything to provide medical care.

131.    Nurse Box never came to see or assess Mr. Foard until he was found dead.

132.    Thus, at approximately 9:49 p.m., when Nurse Box finally decided to go see Mr. Foard, Deputy Dodge opened the cell door, smacking her hand on the wall and calling out Foard's name repeatedly, with no response.

133.    RN Box could not find a pulse because Mr. Foard had already died on the floor of his cell surrounded by his own bloody vomit.

134.    EMS personnel arrived and took over efforts to revive Mr. Foard. RN Box told EMS personnel that Foard's heart rate and respirations had been elevated.

20

135.    Efforts were made to revive Mr. Foard but it was too late. According to the autopsy report, he died on the floor of acute peritonitis due to a perforated duodenal ulcer.

136.    On autopsy, Mr. Foard had a liter of cloudy brown fluid in his peritoneal cavity, gastric contents in his respiratory system, and his stomach contained dark brown fluid.

137.    Mr. Foard was entirely savable with a very good prognosis if he had been timely sent to a hospital at any time by these Defendants before he was found unresponsive after his 15-hour ordeal in booking.

### Individual Nurses Acted with Deliberate Indifference

138.    Nurse Snooks and Nurse Box were subjectively aware of Mr. Foard's obvious serious medical condition, and each disregarded the substantial risk posed.

139.    Nurses cannot diagnose the cause of medical symptoms, or rule out a serious cause, without involving a doctor. They have a duty to relay such abnormal behaviors like passing out or falling down, or severe stomach pain to a provider.

140.    When RN Snooks did a nursing assessment of Mr. Foard the morning of August 16, she was consciously thinking he might have an appendicitis, a condition that could not be treated in this Jail. RN Snooks was consciously aware that Mr. Foard could be experiencing a life-threatening condition but did a cursory exam and decided to rule out serious conditions on her own.  It was recklessly outside the nursing scope for RN Snooks to decide that a patient's persisting 10 out of 10 abdominal/stomach pain has a benign, as opposed to a dangerous, cause.

141.    It was also required by Defendant Snooks' licensure to call someone who could diagnose the source of the problem or send Mr. Foard out to a higher level of acuity. Instead she unilaterally decided, flagrantly outside of the required scope of her practice, not to relay his

21

symptoms to a provider and to warehouse him in 'medical monitoring' without even telling the deputies what to monitor.

142. Over the rest of her shift, close to 11 hours, Nurse Snooks did not assess Mr. Foard, even while knowing he was still persistently vomiting.

143. Similarly, it was recklessly outside the scope of Nurse Box's nursing license to decide that Mr. Foard's slumping to the ground was caused by dehydration on August 15, without involving a provider. Nurse Box knew that dehydration can be life threatening and that she cannot rule out or diagnose without taking a substantial risk of harm to her patient.

144. Nurse Box also did not even actually treat him for the serious condition of dehydration, with IV fluids or continued electrolytes, further showing her deliberate indifference.

145. Nurse Box was back on duty around 6:00 p.m. the evening of August 16, and admitted she heard Foard calling out to see her when she came back on shift. It was reckless not to attend to him when she knew he was back in a booking cell, had been weak and sick the night before, that she had disregarded Deputy Garcia's report of his illness on her last shift, and that he was now yelling out for help.

146. Defendant Box knowingly chose not to evaluate Mr. Foard or send him to the hospital, even though she knew he had been weak and struggling to walk or stand since early that morning, that he had 10/10 abdominal pain, that he had been vomiting all day, so much that he had to be moved to three different cells, that she could see him writhing on the floor and hear him yelling for help, that lay deputies who were "medically monitoring" him were reporting to her that he was drinking toilet water and vomiting all day.

147. Asked by CBI investigators about her shocking decision to walk past her patient in

an obvious medical crisis, Defendant Box admitted she was following her deliberately indifferent assumption that inmates who ask for her help when she comes on shift, as Mr. Foard was doing, are faking or malingering. She put this in her own words as follows: "it's not abnormal for us to come in and everybody sees it's medical and everyone all of a sudden has a medical issue, needs to be seen…."

148.    Asked further why it took her so long to respond to Mr. Foard's plea for her help, Defendant Box stated that she had too many other job duties as the lone SHP nurse that evening, including "med pass" and "housing checks."

149.    If Nurse Box did not have time or was otherwise unable to timely evaluate a patient's serious medical condition, she needed to send him to the hospital immediately.

150.    In an overt effort to divert attention from her liability, RN Box falsely claimed to CBI investigators that all of Mr. Foard's vital signs were "completely fine," that "he gave no other indication that he had any other health issues and all of his symptoms and everything were on par with his withdrawal and he wasn't complaining of anything abnormal that didn't come with withdrawal."

151.    Individual County employees also reported to CBI that they told Defendant nurses about Mr. Foard's medical emergency and pain, but the nurses told them that his vital signs were normal.

152.    However, Foard's SHP medical records chart his vital signs for the last time at 3:27 a.m. in the early morning of August 16, around the time when he was moved by RN Box to general population housing.

153.    There are no further vital signs charted in his records for the next 18 hours before

23

he was found unresponsive at 9:49 p.m. later that night.

154. These nurses could not possibly have known that Foard's vital signs were continuing "within normal ranges" while he was deteriorating in booking for 15 hours, because they did not take them.

155. Both of these nurses also knew that sudden, sharp, acute abdominal pain is not a symptom of withdrawal.

156. Defendant Box also told investigators, asking what it would take for her to send an inmate to the hospital, that she would need to see vital signs that were "way out of whack, they're not keeping any fluids down."

157. Mr. Foard's untaken vital signs were indeed abnormal. He could not hold down any fluids -- all that day he had been vomiting the fluids he tried to take down.

158. In refusing to call a provider or send Mr. Foard to the hospital to secure Mr. Foard a real medical diagnosis and life-saving treatment, Defendant RNs Snooks and Box utterly violated their constitutional duties as gatekeepers.

159. Dr. Lopez was the Medical Director and doctor on call at the time of Mr. Foard's incarceration. Alternatively, in the event that any of the individual defendants did relay Foard's serious symptoms to Medical Director Dr. Lopez, or that he had any involvement in Mr. Foard's care, his failure to immediately send Mr. Foard to the hospital was deliberately indifferent.

160. Per CBI's investigation report, Dr. Lopez refused to even participate in the investigation into Mr. Foard's death. As the investigator described this non-participation: "All of my attempts to contact him have met with negative results and he has not returned any of my phone calls to him."

**Individual County Defendants were Deliberately Indifferent to Mr. Foard's Obvious Medical Crisis**

161.    Mr. Foard's medical crisis unfolded and was allowed to continue without intervention by LPCJ Deputies who were present in booking that day, including day shift supervisor Sgt. Ryan Davis, Deputy Patrick Scales, Deputy Courtney Kellinger, Deputy Amanda Dodge, and evening shift supervisor Sgt. Randall Clark.

162.    Individual County Defendants had an independent constitutional obligation to secure medical care. The La Plata County-SHP contract expressly provides that Deputies are fully empowered to independently intervene for medical emergencies and get inmates urgent care:

> County acknowledges that, whether or not an SHP staff member is on-site, in the event of a medical emergency, Jail staff shall retain the right and ability to contact an ambulance provider directly for the transportation of an inmate for emergency medical services outside the Jail or to arrange for transport of an inmate for emergency medical services, and further that, in no event shall Jail staff be required to contact SHP medical staff prior to initiating life-saving measures, contacting the local 911 service…or otherwise seeking the highest priority emergency medical attention….

163.    Individual County Defendants each knew that Mr. Foard was not being medically monitored, and that the deputy "monitoring" consisted of them merely observing his decline.

164.    Individual County Defendants each knew that nurses did not ever go into Mr. Foard's cell, did not take his vitals, and did not even provide any additional fluids or electrolytes, despite his copious vomiting.

165.    Individual County Defendants also knew, from their direct observation, that this man left under their monitoring was sweating, vomiting, and complaining of severe stomach pain all day on August 16. In fact, Mr. Foard's vomiting was so prodigious that he had to be moved out of two different booking cells he had soiled with vomit.

166. This was such an obvious medical emergency that it did not take any specialized medical training for these lay persons to realize it as such.

167. While some of these Individual County Defendants claim to have been keeping SHP medical staff informed about Foard's condition throughout the day in post-death incident reporting, Defendant Box denies that claim. Asked by CBI if booking Deputies had said to her "hey maybe you need to come check on him or he's complaining of being sick," she told the investigators: "Nope."

168. Regardless, if the Deputies were repeatedly calling medical as they claim, they knew they were not receiving any medical responses, which triggered their duty to independently act as gatekeepers to secure urgent care for a man who was deteriorating before their eyes.

169. Under these circumstances, it was not reasonable to rely on medical's actions given nursing Defendants' abject derelictions, and Defendants Scales, Davis, Kellinger, Dodge, and Clark were required by the United States and Colorado Constitutions to call an ambulance for this man in obvious medical crisis.

170. With utter deliberate indifference, knowing they were empowered to do so by the above-quoted policy, they did not.

171. Individual County Defendants, however, not only refused to call an ambulance for a man talking about dying, with blood clearly visible in his vomit, but they also stopped bringing Mr. Foard water and cruelly ignored his begging them for it more than once.

172. Defendants Scales, Davis, Kellinger, Dodge, and Clark each chose to ignore what was undeniably happening in front of them, and thus violated their independent constitutional obligations as gatekeepers to get Mr. Foard to the hospital where he could get the medical treatment

he needed to survive, and which these Defendants knew he could not get at the Jail.

### *Deputy Scales*

173.    Deputy Scales was present for the interaction with Mr. Foard and Nurse Snooks. He spoke with Deputy Garcia and learned that Mr. Foard had been weak, had repeatedly fallen down, and had reported 10/10 sharp, shooting abdominal pain.

174.    Deputy Scales was called down by Deputy Garcia the morning of August 16, 2023, and arrived to find Mr. Foard laying on the table talking to RN Snooks. He heard Foard's complaints of intense stomach pain, and that the nurse decided to move him back to booking "where he could be continuously watched on medical observation."

175.    Deputy Scales then brought Foard back to booking and put him in HC4 "so that all booking stations could easily see him." He then had a front row seat for the rest of his shift and knew about Mr. Foard's persistent vomiting, profuse sweating, labored breathing, and his very loudly expressed suffering.

176.    Deputy Scales knew that nursing never even went into the cell or provided any care for Mr. Foard, but did not advocate with SHP medical to treat him, did not call an ambulance, or do anything to perform his gatekeeper role of obtaining obviously necessary medical care.

177.    Either Deputy Scales did not relay his observations of Mr. Foard's intense vomiting and severe pain and discomfort to nurses as required, or he relayed it and did nothing further to secure that the nurses actually responded, which was also required, given the obvious risk to Mr. Foard.

178.    Deputy Scales' conduct was deliberately indifferent in that he knew of and disregarded an excessive risk to Mr. Foard's health or safety. Deputy Scales' role in this particular

27

medical emergency was solely to serve as a gatekeeper to medical personnel capable of treating his condition, but he refused to fulfill that gatekeeper role.

### Sergeant Davis

179. Defendant Sergeant Davis was the day shift supervisor for Deputy Defendants on August 16, 2023. He observed that for most of the day Mr. Foard was complaining of stomach pain. Sgt. Davis could also hear and see Foard's loud vomiting and agony throughout his shift. Sgt. Davis also knew that nursing staff never checked on Mr. Foard, did not take vitals, or provide any medical care.

180. Sergeant Davis specifically claims to have told RN Snooks about Foard's sweating and vomiting and complaints of stomach pain, and that RN Snooks responded that his vital signs were normal. However, no vital signs were taken. Sergeant Davis knew nurses were not checking on Mr. Foard or evaluating him.

181. Either Sergeant Davis did not relay his observations of Mr. Foard's intense vomiting and severe pain and discomfort to nurses as required, or he relayed it and did nothing further to secure that the nurses actually responded, which was also required, given the obvious risk to Mr. Foard.

182. Sergeant Davis claimed after the fact that medical staff told deputies that Foard's vital signs were "within normal ranges." But Sergeant Davis and the rest of the Defendant Deputies all knew Foard was never even seen by medical all day. Sergeant Davis did nothing to advocate with SHP medical staff he knew were not evaluating or monitoring a man with an obviously dire medical emergency or send Mr. Foard to the hospital.

183. Sergeant Davis' conduct was deliberately indifferent in that he knew of and

28

disregarded an excessive risk to Mr. Foard's health and safety. Sergeant Davis' role in this particular medical emergency was solely to serve as a gatekeeper to medical personnel capable of treating his condition, but he refused to fulfill his gatekeeper role.

### *Deputy Kellinger*

184.    Defendant Deputy Kellinger was the "floating" Deputy on August 16 and worked from 10:00 a.m. to 10:00 p.m. that day. Deputy Kellinger observed and listened to Mr. Foard's agony, vomiting, and yelling throughout the day. She also knew that he was desperately drinking water out of the toilet.

185.    Defendant Kellinger likewise did nothing for a man she knew was being warehoused and ignored by SHP nurses. Deputy Kellinger did not advocate with medical staff on Mr. Foard's behalf, did not call an ambulance, and did nothing to get Foard to the hospital.

186.    Defendant Kellinger violated her constitutional obligation as a gatekeeper to get Foard to the hospital where they had the licensed and trained medical personnel, and the testing, diagnostic, and operating tools necessary to keep him alive.

187.    Either Deputy Killinger did not relay her observations of Mr. Foard's intense vomiting and severe pain and discomfort to nurses as required, or she relayed it and did nothing further to secure that the nurses actually responded, which was also required, given the obvious risk to Mr. Foard.

188.    Deputy Kellinger's conduct was deliberately indifferent in that she knew of and disregarded an excessive risk to Mr. Foard's health and safety. Deputy Kellinger's role in this particular medical emergency was solely to serve as a gatekeeper to medical personnel capable of treating his condition, but she refused to fulfill her gatekeeper role.

29

***Sergeant Clark***

189. Defendant Sgt. Clark, the night shift supervisor on August 15th and 16th baselessly decided that Mr. Foard was faking his symptoms and recklessly did not intervene to obtain care for him.

190. Sergeant Clark knew that Mr. Foard had been weak and falling over the day before, and that he was then cleared from withdrawal checks to go to general population. He knew that Foard then had a worsening of his condition and was placed back in a holding cell for medical observation. He knew that Mr. Foard was vomiting and defecating on himself, and that he had to be moved to multiple holding cells due to persistent and copious vomiting.

191. He watched as Mr. Foard was sweating in his cell, complaining of stomach pain, and vomiting.

192. Sergeant Clark thus also had a front row seat to Mr. Foard's agony and deterioration on August 16 and interacted with him directly on several occasions. He did nothing for this critically ill man except occasionally bring Foard water and tell him to vomit into a drain rather than on the floor.

193. Either Sergeant Clark did not relay his observations of Foard's intense vomiting and severe pain to nurses as required, or he relayed it and did nothing further to secure that the nurses actually responded, which was also required, given the obvious risk to Mr. Foard.

194. Sergeant Clark claims after the fact that SHP medical staff told deputies that Foard's vital signs were "within normal ranges." But Sergeant Clark and the rest of the Defendant Deputies all knew that medical staff had not even seen Foard all day. Sergeant Clark did nothing to advocate with medical staff who he knew were not monitoring a man with an obviously dire

30

medical emergency or call an ambulance himself. Rather, Defendant Clark watched on video as Mr. Foard suffered immensely before he died.

195.    Sergeant Clark's conduct was in part motivated by his reckless and baseless decision that Mr. Foard was "faking" his symptoms.  While ignoring the obvious suffering of Mr. Foard's uncontrollable medical crisis and the blood-tinged vomit, Defendant Clark then outrageously told Foard to "try to hit that drain" with his vomit because they "can't keep switching you out to clean."

196.    Sergeant Clark's conduct was deliberately indifferent in that he knew of and disregarded an excessive risk to Mr. Foard's health and safety. Sergeant Clark's role in this particular medical emergency was solely to serve as a gatekeeper to medical personnel capable of treating his condition, but he refused to fulfill that gatekeeper role.

### *Deputy Dodge*

197.    Deputy Amanda Dodge was assigned to booking the evening of August 16th with Sergeant Clark.

198.    Deputy Dodge had escorted Mr. Foard to his general population cell the night before on the 15th, and admittedly seen him "really struggling," short of breath, and so unsteady on his feet that he could hardly walk, which to her was "crazy."

199.    As she explained to CBI investigators, she was "in the booking station with Sergeant [Clark], I was kind of and then just taking care of everyone…and also checking on [] medical observation people."

200.    Deputy Dodge knew full well that Mr. Foard was very profoundly sick. Thus, she admitted to CBI investigators she saw the floor of his cell in HC4 "just covered in vomit" and

"pretty dirty." She further explained her comment about Foard's cell being "pretty dirty," stating: "I think it was defecating."

201. Deputy Dodge had a duty to obtain medical care for a man who was so sick he covered his cell in vomit and feces or blood.

202. Like Sergeant Clark, Defendant Dodge was more focused on not having to clean another cell than helping Mr. Foard with his obvious crisis. She told CBI investigators that their plan was: "we'll get [HC5] cleaned up and then we'll put him into six and then hopefully he can stay clean and he knows the deal that he needs to make it to that gutter."

203. Deputy Dodge joined in callously instructing Mr. Foard to aim his vomit, rather than addressing his obvious medical crisis.

204. Mr. Foard, understanding the severity of his condition, yelled out, "I need to go to the hospital!" not long after Sgt. Clark told him to aim for the drain.

205. Deputy Dodge, in an effort to divert from her liability, falsely claimed to CBI investigators that Foard did not complain of pain or ask to go to the hospital, instead pretending that he merely asked for Gatorade, and was otherwise just "happy to be out of his own filth."

206. Mr. Foard was not "happy to be out of his own filth." He was in grievous and overwhelming pain and had been unconscionably suffering for many hours.

207. Mr. Foard can be seen trying to comply with Sgt. Clark's and Deputy Dodge's deliberately indifferent and obviously unfollowable instructions to not make a mess while perceiving he was dying. He vomits into a water cup, pours the contents down the floor vent, and continues to loudly gag and retch. His short and labored breathing, and his loud groans and moans, are clearly audible. He again and again calls out vainly for help.

32

208.    As can be heard on the audio of his HC6 cell video, which was being monitored by Sgt. Clark and Deputy Dodge, Mr. Foard was constantly retching, groaning and grunting and vomiting, and repeatedly yelling out for water, a nurse, and to go to the hospital, while expressing his accurate perception that he was going to die.

209.    Deputy Dodge's conduct was deliberately indifferent in that she knew of and disregarded an excessive risk to Mr. Foard's health and safety. Deputy Dodge's role in this particular medical emergency was solely to serve as a gatekeeper to medical personnel capable of treating his condition, but she refused to fulfill that gatekeeper role.

**SHP's and La Plata County Unconstitutional Policies, Customs and Practices Were Moving Forces in the Death of Daniel Foard**

210.    SHP and La Plata County maintained policies, practices and customs that were the moving force in the death of Mr. Foard.

211.    Here, Defendant RNs Snooks and Box acted pursuant to SHP's unconstitutional, profit-driven corporate policies and customs that are deliberately indifferent to detainees and inmates' serious medical needs. Specifically, these unconstitutional policies and customs include:

- Recklessly understaffing its jails with a single nurse and no on-site medical provider, and recklessly relying on and requiring nurses to practice dangerously outside the scope of their licensure;

- Recklessly and routinely using and relying on untrained, unlicensed, and unskilled deputies to perform medical monitoring, and not doing any medical monitoring by medical staff;

- Recklessly relying on nurses who practice outside of their nursing scope of practice, by: not relaying abnormal findings to doctor's, diagnosing or ruling out serious conditions on their own, and conducting medical monitoring visits by looking into a cell door window while walking by without talking to or evaluating the inmate;

- Recklessly allowing persistent dehydration and vomiting to continue unchecked without meaningful intervention;

33

- Recklessly failing to adopt any system for nurses to communicate to deputies, on whom they rely for medical monitoring of inmates, to understand why the inmate has been placed on such monitoring status;

- Recklessly presuming that an inmate is malingering or faking their serious symptoms and withholding treatment on that basis;

- Recklessly failing to timely respond to inmates experiencing serious deterioration in their medical condition, and recklessly failing to hospitalize inmates with obviously serious medical needs whose needs they know cannot be met within the jail;

- Recklessly disregarding even dangerous and continuous symptoms as 'withdrawal' or benign causes, without addressing the danger from the symptoms themselves.

212.   La Plata County is non delegably liable for SHP's unconstitutional policies. Although La Plata County chose to privatize the provision of healthcare services the detainees and inmates at LPCJ, it has its own non-delegable duty to provide constitutionally adequate care. The County cannot contract away its constitutional obligation and is legally liable for the deliberately indifferent polices, customs, and practices, some of which are joint County and SHP policies, as moving forces in the deliberately indifferent medical care and treatment of Mr. Foard.

213.   La Plata County is also liable for the deliberate indifference of each individual County Defendant because they were acting pursuant to La Plata County's unconstitutional, policies and customs that are deliberately indifferent to detainees' and inmates' serious medical needs. Specifically, these unconstitutional policies and customs include:

- Contracting to save money by understaffing its jail with a single nurse and no on-site medical provider, and recklessly relying on and requiring nurses to practice dangerously outside the scope of their licensure;

- Recklessly and routinely using and relying on untrained, unlicensed, and unskilled Deputies to perform medical monitoring;

- Recklessly allowing persistent dehydration and vomiting to continue unchecked without meaningful intervention;

- Recklessly failing to adopt any system for nurses to communicate to Deputies,

on whom they rely for medical monitoring of inmates, to understand why the inmate has been placed on such monitoring status;

- Recklessly presuming that an inmate is malingering or faking their serious symptoms and withholding treatment on that basis;

- Recklessly failing to timely respond to inmates experiencing serious deterioration in their medical condition and recklessly failing to hospitalize inmates with obviously serious medical needs whose needs they know cannot be met within the jail;

- Recklessly disregarding even dangerous and continuous symptoms as 'withdrawal' or benign causes, without addressing the danger from the symptoms themselves.

214.    SHP's local and nationwide unconstitutional policies and practices, often implemented to maximize profits at the expense of care, have caused a host of abject neglect and abuse by the company.

215.    These policies, customs, and practices were moving forces behind the violation of Mr. Foard's constitutional rights and caused his senseless suffering and death.

216.    SHP is a private, for-profit correctional healthcare corporation, holding hundreds of contracts to provide medical care in jails in numerous states, including Colorado.

217.    In 2016, La Plata County Sheriff Sean Smith was looking, in part, to reduce costs of medical care at the LPCJ. The County put out an RFP and received bids from two jail medical contractors: SHP and Correctional Health Partners ("CHP").

218.    As illustrated below, the County decided to contract with SHP, which had significantly underbid CHP. (SHP bid $501,600.00 for one year, while CHP bid $385,310.00 for six months, equivalent to $770,620.00 for a year):

35



219.    A significant part of SHP's ability to underbid CHP was due to its deliberate choice to staff LPCJ with nurses only, and at a significantly lower number of hours. SHP's bid for this contract promised 168 hours/week (or 4.2 FTE) of work by its medical team, while CHP's bid promised 262 hours per week (or 6.55 FTE) of work.

220.    La Plata County chose SHP, with jail medical services beginning at the Jail on June 1, 2016. The County and SHP have extended this contract multiple times and did so for 2023.

221.    For the 2023 extension, the County chose to *not* bid out this contract, and thus was required by statute to justify its "sole source" contracting decision. As explained in a March 16, 2023, email by La Plata County Sheriff's Office Detentions Division Commander Ed Aber, the County found SHP's continued significant underbidding an important reason why this contract would not be bid out: "I have done some informal cost comparisons with other service providers that meet medical needs in other Colorado Jails, and our contracted price is significantly lower than those other service providers. I have no doubt that SHP would win a bid if it went to that."

222.    SHP's underbidding of other jail medical contractors was thus continuing to make it a very attractive option for the County, albeit unconstitutional, as it delegated its duty to SHP to provide adequate medical services at LPCJ.

223.    SHP thus has profound financial incentives to understaff its jails.

224.    In 2023, the year of Mr. Foard's death, SHP expressly agreed with La Plata County to "provide and/or arrange for all professional medical and related health care and administrative services for the [LPCJ] inmates," including "nursing care," "regular physician care," "emergency medical care," and "emergency ambulance services when medically necessary." SHP and the County well knew their actual plan lacked capacity to fulfill this obligation.

225.    SHP also agreed to medical staff "reasonably necessary for the rendering of health care services to inmates at [LPCJ]" and that SHP would be "financially responsible for the costs of all staffing required under this agreement." SHP's staffing schedule, which was provided to the County in Exhibit 2.1 of the 2023 contract, illustrates SHP's decision and LPC's acceptance, despite its promise to provide "reasonably necessary" medical staff, to pay for only one nurse to be on-site at any given time, and no on-site medical doctor or other provider with diagnostic licensure or capability, thus saving significantly on its labor costs.

226.    Pursuant to its 2023 contract with the County, SHP staffed the Jail with only a single nurse during the day shift, and a single nurse during the night shift.

227.    SHP designated a licensed physician as the Jail's "Medical Director," who contractually was required to visit the Jail once per week and spend a minimum of four hours either providing direct care to inmates or reviewing the direct care provided by SHP nurses. The SHP designated Medical Director for LPCJ, Victor Lopez, MD, was also supposed to be available for the Jail's nursing staff for consultation and direction 24 hours/day and 7 days/week. However, SHP did not commit to any restrictions whatsoever on this Medical Director's other professional commitments, such as maintaining a private patient caseload or working at other SHP jails. In fact,

most SHP medical providers or "Medical Directors" manage a large private patient caseload and work at multiple other jails.

228.    SHP's unconstitutional understaffing had profoundly negative consequences for Mr. Foard, as the SHP Medical Defendants did not see him on his final day because they were too busy even to attend to a dying man, let alone just a sick one.

229.    When asked by CBI investigators why she refused to see Mr. Foard, Nurse Box pointed to all the med passes and housing checks she had to do as she came on shift, a clear indictment of SHP's deliberate understaffing of this Jail.

230.    SHP's promise to provide LPCJ with "reasonably necessary" medical staff bears little resemblance to the ground-level reality of SHP's deliberately indifferent short staffing of its jails. Indeed, SHP routinely staffs its jails under similar arrangements: on-site nurses and remote medical directors who are supposedly available to consult with them but who rarely, if ever, visit in person or provide any actual supervision. These nurses do not maintain regular communication with the designated providers and frequently make patient-care decisions independently.

231.    SHP's deliberate understaffing and lack of involved medical providers has the causal effect of encouraging and forcing unqualified nurses to make diagnostic medical decisions that are far outside the scope of their license. This has a predictable and detrimental impact on patient care, particularly in situations where emergency medical care is necessary but is either impermissibly diagnosed or ignored by an unqualified RN.

232.    That is precisely what happened to Mr. Foard. SHP intentionally used Nurses, like Nurses Snooks and Box, to make provider level life and death medical decisions while utterly unsupervised by any higher-level medical provider. There is no evidence that he was ever seen by

SHP's Medical Director, or that Defendant ever called a doctor for guidance or direction about Mr. Foard's condition. Instead, again, acting well outside the scope of their licensure, training, experience, or capability, Defendants Snooks and Box ruled out dangerous causes of Mr. Foard's serious medical condition, vomiting, and pain.

233.    Entity Defendants' deliberate understaffing of LPCJ also has the practical effect of causing its overburdened nurses to conduct their medical monitoring visits via "walk-by," ignoring abnormal vital signs and allowing persistent vomiting and dehydration to go unchecked without meaningful intervention. SHP nurses are thus encouraged and forced to conscript unlicensed and untrained Deputies to perform medical monitoring tasks no lay persons can be conscionably permitted to perform. This saves the County money and allows SHP to make money by staffing LPCJ at a level that is obviously going to cause constitutionally inadequate medical care.

234.    Mr. Foard was in "medical monitoring" in the booking area for 15 hours without any nursing monitoring, any vitals taken, or anyone assessing his symptoms.

235.    SHP and County policies require that vitals be taken twice a day on people in observation or medical monitoring. Nurses are also required to take vitals during every nursing assessment of a patient.

236.    Yet Mr. Foard's medical monitoring did not even include monitoring vital signs, as there is no record they were taken at all for the 18 hours he spent vomiting blood in the booking area before he was found unresponsive at 9:49 p.m. on August 16, 2023.

237.    This indifferent failure to take vitals was part of a routine policy violation caused, in significant part, by SHP and the County's deliberately indifferent short staffing of medical personnel.

238.    When CBI investigators asked Defendant Snooks why Mr. Foard had gone so long without having his vitals checked, she responded that this was not unusual and was because of the staffing at the jail compared to the number of inmates.

239.    Not having enough staff to take required vital signs on inmates in medical monitoring is reckless and reflects conscious disregard to the risk to life and safety of inmates.

240.    Defendant Snooks also failed to communicate with the Deputies she was relying on to purportedly monitor Mr. Foard, what signs and symptoms they should be looking for.  Individual County Defendants told investigators that persistent vomiting was normal with withdrawal, which Mr. Foard wasn't on, and which the jail as a matter of course tolerates. Sergeant Clark saw the bloody vomit and failed to communicate it or communicated it and nurses didn't respond.

241.    His vomiting blood and dehydration were also allowed to go unchecked without meaningful intervention by Defendant Nurses Snooks and Box, who if they saw Foard at all after 6:30 a.m. on his final day, did so by a deliberately indifferent quick glance into the window of his cell as they walked by, ignoring his heard requests for care.

242.    Defendant Box also admitted to routinely engaging in presumptions that patients are faking or malingering.  She said, in this regard, that when she comes on shift, "all of a sudden everyone has a medical issue," as if they are pretending to need medical help, underscoring SHP's unconstitutional custom of allowing its nurses to rely on assumptions of fakery or malingering to justify not timely responding to inmates asking for medical help.

243.    Such is the very predictable danger of SHP's conscious and profit-driven decision to understaff its jails, including LPCJ in particular; with only a single nurse who has too much other work to do, she chose not to respond to a man loudly dying on their watch.

40

244. Since at least 2015, SHP officials have had ample notice of the unconstitutional dangers to which they are regularly exposing and subjecting inmates with their cost-saving understaffing model.

245. In *Shadrick v. Hopkins County,* an SHP nurse, who was about to go off shift, unilaterally decided to admit an inmate into the jail, who reported he had been vomiting, had frequent infections, and had an ongoing infection in his groin, without taking his vital signs or examining him. This nurse put the inmate on detoxification protocol for suspected drug use and medical watch because of his infection. Follow-on nurses also declined to take vital signs or examine the inmate despite obvious signs of his emergency medical condition. The inmate died days later of a MRSA infection. 805 F.3d 724, 729-30 (6th Cir. 2015).

246. SHP also relied on an on-site nurse and a remote medical director to provide care at the Montgomery Jail in Kentucky. *Rice v. Montgomery Cnty*, No. 5:14-cv-181-KKC, 2016 U.S. Dist. LEXIS 59605, at *3-4, 41-42 (E.D. Ky. May 5, 2016). The remote medical director testified that he physically visited the jail only once every three months. *Id*. at *34. He also testified in a deposition that he had his own full-time, private practice (where he saw 20-24 patients a day) and served as medical director at 21-23 other jails at which SHP provided health care services. The *Rice* court found the evidence sufficient to establish SHP's liability for constitutionally inadequate supervision. *Id*. at *41-43.

247. The predictably dangerous consequences of this staffing model were again laid bare *Kindoll v. Southern Health Partners*, *et al*. Michelle Kindoll was incarcerated at the Grant County Detention Center and put on withdrawal protocols. She was cleared two days later and moved to a general population cell, where she began experiencing the classic symptoms of a stroke, including

weakness, vision loss, and inability to use her legs such that she needed help from other inmates to stand up or sit down. As in its other jails, SHP relied on exclusively nurses for on-site medical care, and on medically untrained deputy "monitors" to watch for changes in condition. As her symptoms worsened, Ms. Kindoll was seen by a series of nurses, all of whom diagnosed her condition without a call to their nominally supervising doctor. One of the untrained deputies tasked with "monitoring" Ms. Kindoll put her in an isolation cell and failed to put her on medical watch, despite having to physically carry Kindoll to her cell. During a later attempt at a shower, Ms. Kindoll fell, and was unable to get up, dress herself, or ask for help. The supervising Commander of the deputy "monitors" was called down, and Ms. Kindoll was then brought to medical. An SHP RN performed a cursory exam, observed Kindoll's obvious signs of a stroke, but sent her back to an isolation cell without calling the doctor. Alerted by a concerned deputy about this nurses' decision, the supervising Commander said she would "make a few calls," but did nothing further. Some hours later the RN finally sent Kindoll to the hospital. But because of the hours wasted Kindoll arrived outside the treatment window for stroke-mitigation medication and was left permanently impaired. The *Kindoll* Court denied the SHP Nurse's motion for summary judgment, noting the reckless and unsupervised nursing decision to send a woman with obvious and severe signs of a stroke back to isolation for "medical monitoring." Summary judgment motions by a County Deputy and the Commander were similarly denied, given their knowledge that the SHP RN was clearly failing their own gatekeeper duty.  Finally, the *Kindoll* court denied the motion of an upper management jailor, who oversaw SHP's medical care and did nothing about its routine use of nurses who could not recognize medical emergencies and unlawfully diagnosed patients

42

without guidance from a doctor. *Kindoll v. Southern Health Partners*, *et al.,* No. 17-84-DLB-CJS, 2019 WL 1409842, *2-6, 8, 11-13, 15-16 (E.D. Ky. Mar. 28, 2019).

248.    SHP endorses these insufficient staffing models at the highest level of the company. In a deposition, SHP CEO Jennifer Hairsine acknowledged that medical directors act in a remote capacity. She further indicated that, so long as off-site medical directors "can perform their duties," the company is "fine with" having them juggle numerous contracts and carry a full-time private practice caseload. CEO Hairsine further testified that there is no individual within SHP specifically charged with ensuring that jail medical directors adhere to their contractual obligations.

249.    Individual Defendant Nurses conduct is not a bug but a feature of SHP's widespread pattern of deliberate policy choices in its jails. Indeed, SHP enabled a supervision structure for nurses so diffuse as to render it meaningless. CEO Hairsine testified that supervision of on-the-ground nursing staff is a "team effort," from "senior management" within the company's corporate office "to our VP of operations out in the field, regional directors, regional representatives." CEO Hairsine added that the logistics of supervision "can be done in a variety of ways." In other words, there was and is no set structure for supervision, no standard methods, and in many instances and in this very case, an express practice of allowing nurses to act outside the scope of their medical licenses.

250.    SHP's staffing practice does not result merely in communications breakdowns or misunderstandings. Rather, it had the very foreseeable result of leaving nurses alone, as here, to field a variety of complex patient needs well beyond the scope of their authority, without clarity on who is responsible for their supervision.

251.    These Nurses, pursuant to SHP and La Plata County's customs and practices, rely extensively on deputies to do medical "monitoring," because they are cheaper and allows the company to significantly underbid its competitors, including CHP's bid for this contract at LPCJ. This pervasive business practice of relying exclusively on Nurses and Deputy medical "monitors," without adequate supervision, or as in Mr. Foard's case, no supervision at all, had predictable and dire outcomes.

252.    SHP has also been on notice for a very long time about the dangers of understaffing its jails to such a degree that SHP nurses must rely on medically untrained Deputies as de facto caregivers. In *Richard v. Southern Health Partners, Inc., et al.,* No. 2:09-CV-00020-DLB (E.D. Ky. 2009), according to deposition testimony in that case, the decedent Kenneth Marcum was moved to a medical observation cell after a Deputy allegedly alerted an SHP nurse that Marcum was sweating profusely, had produced bloody sputum, and was complaining of pain. As here, Mr. Marcum was allegedly warehoused and ignored in a cell he was put in specifically for medical monitoring. The SHP nurse on shift – who did not take vital signs or look into the cell at all during their shift, failed to monitor or evaluate Marcum. Deputies, who were supposed to be checking on Marcum every twenty minutes, also allegedly failed to conduct any meaningful monitoring of a man with an obviously serious medical crisis. None of the unsupervised SHP nurses called SHP's nominally supervising doctor. Like Mr. Foard, Kenneth Marcum was simply allowed to die on the floor of his cell after many hours of agonizing pain, without a diagnosis and without treatment. Mr. Foard's death around 15 years later demonstrates that SHP continues to put its own profits over the well-being of its inmate-patients, and its well-understood constitutional duties.

253.    In *Sietsema v. Hardin County*, Mark Sietsema was incarcerated at the Hardin County Jail with a known medical history of chronic diverticulitis (bowel obstruction).  At the Jail, he exhibited classic symptoms of recurrent diverticulitis, including abdominal pain, an inability to have a bowel movement for six days, and persistent vomiting. As in Mr. Foard's case, SHP staffed this jail only with nurses who were nominally supervised by a doctor. In deposition testimony, this doctor admitted that he was SHP's "Medical Director" at six other jails, while also running a family practice where he saw thirty patients a day, Monday through Thursday, and 15 more patients on Fridays. Presumably because he could not possibly meet his commitment to SHP, this doctor had hired an NP to help him supervise the nurses at Hardin County Jail. Mr. Sietsema complained repeatedly to SHP nurses that he had not had a bowel movement in six days, was throwing up persistently and had abdominal pain. Cellmates could see this obvious medical crisis unfolding, so they submitted medical requests for Sietsema to be seen. In response, SHP nurses allegedly moved Sietsema to an isolation cell and gave him only clear liquids and over-the-counter nausea medication. For the last four-day period before he was finally allowed to go to the hospital, SHP Nurses provided Mr. Sietsema with nothing: no medical treatment, and no call to a provider despite a constellation of serious symptoms of an internal medical emergency. When Mr. Sietsema was finally sent to the hospital, he was rushed to the ICU at another hospital due to his critical condition. There, he suffered respiratory failure, had bilateral chest tubes placed, and was diagnosed with subcutaneous emphysema, because he was allowed by SHP nurses to vomit and retch persistently for a two-week period. As in Mr. Foard's case, Mr. Sietsema was warehoused in an isolation cell while SHP nurses provided cursory responses like anti-nausea medication and clear liquids, knowingly inadequate treatments for persistent and profuse vomiting. As in Mr. Foard's case, SHP

Nurses simply looked the other way while profuse vomiting and serious abdominal pain continued unabated, while they recklessly diagnosed benign causes of such alarming symptoms without so much of a phone call to a supervising doctor. Mr. Sietsema was lucky to escape with his life, thanks to hospital providers, treatment Mr. Foard was never afforded. *Sietsema v. Hardin County, et al.*, No. 3:11-cv-256-CRS-DW, Doc. No. 1, (W.D. Ky. Apr. 29, 2011).

254.    Dylan Stratton also died on the floor of his jail cell after being recklessly ignored by SHP nurses and the security staff they relied on for medical monitoring.  Incarcerated on a drug charge, Mr. Stratton told deputies that he was on prescription medication for high blood pressure and a psychiatric disorder. He was flagged for possible drug withdrawal and placed in a Franklin County Jail detoxification cell for observation. While on observation Stratton allegedly became dehydrated, suffered a seizure, and exhibited signs of active psychosis, rolling on the floor of his cell and screaming out delusional statements like "please start the car!" Mr. Stratton's physical and mental decline was so obvious at arraignment that the Judge asked Deputies if he was getting adequate medical treatment at the Jail. Deputies assured the Judge that he was. When Stratton missed a subsequent preliminary hearing because he was too sick to attend, the Judge summoned Deputies to her chambers to again make sure he was getting adequate care. For the second time, Deputies assured the Judge that he was. Other than occasional entries in his withdrawal flowchart and some fluids, however, SHP nurses did nothing for Mr. Stratton but warehouse him in a detox cell, while he catastrophically deteriorated, declining to even call their nominally supervising APRN. Instead, just as was done with Mr. Foard, SHP nurses recklessly diagnosed Mr. Stratton as merely dehydrated and had Deputies conduct medical monitoring by watching him on a surveillance camera. Deposition testimony laid bare the recklessness of this approach, as Deputies

testified that all they looked for was "living, breathing flesh." Mr. Stratton radically decompensated for several days, vomiting and flail about on the floor of his cell, at times completely naked, while Deputies and SHP nurses did nothing. He died on the floor of his cell at the age of 21 from entirely untreated drug withdrawal. *Glass v. Franklin County et al.*, No. 3:19-cv-51-GFVT-EBA, Doc. #1 (E.D. Ky. July 16, 2019); Order denying Defendants' Motions to Dismiss, 2020 WL 3086602 (June 10, 2020).

255.    Decedent Rebecca Westfield endured a similar tragedy while being "monitored" by SHP nurses and untrained jailors in *Westfield v. Richland County, et al*. She had gone to the hospital for medical attention after a violent sexual assault, but was arrested there for an outstanding warrant related to a low-level drug possession charge. Ms. Westfield was then transported to the Richland County Jail, where she was put in a camera-equipped cell for 'monitoring'. For the next five days, however, SHP nurses warehoused Westfield in this cell, observing her on several occasions but failing to provide any medical care to an inmate who continued to defecate on herself and could not move her own legs. After five days of this 'monitoring' by SHP nurses and jail deputies, Ms. Westfield was found unresponsive on the floor of her cell. She was finally sent to the hospital by ambulance but was pronounced dead within an hour. Like the deliberately indifferent warehousing of Mr. Foard, SHP nurses and deputies in *Westfield*, contented themselves with quick look-sees into her cell. These quick looks at a dying woman, however, were not followed up with any sort of medical care or a trip to the hospital for an inmate who was obviously deteriorating rapidly under their watch. *Est. of Rebbecca Westfield v. Richland County, Ohio et al.*, No. 1:25-CV-00876, Doc. No. 1 (N.D. Ohio, May 1, 2025).

256.    Thirty-three-year-old Glenn Smallwood also fell victim to SHP's reckless understaffing and the company's reliance on low level nurses who diagnose and decline to offer medical treatment to an inmate in the throes of an obvious medical emergency. In *Est. of Smallwood v. Southern Health Partners, Inc., et al.*, Mr. Smallwood was arrested on a misdemeanor public intoxication charge in the midst of a medical and mental health crisis. He was placed in a restraint chair in a detoxification cell and was then seen briefly by an SHP nurse. She found Mr. Smallwood in the restraint chair, limp and unconscious, and tried arousing him with a sternum rub and smelling salts to no effect. This SHP nurse came back in an hour, took vital signs, which were abnormal, and left again. Despite her entry level nursing license and lack of experience, skill, or training to make a medical diagnosis, this nurse did not call her supervising doctor for guidance. Instead, the SHP nurse assured security staff that Smallwood was fine, only to then leave the for the night at the end of her shift. Because SHP had decided to staff this jail with on-site nurses only, this nurses' departure left Smallwood in the hands of medically untrained jailors. Mr. Smallwood died exactly where he was left by the SHP nurse, alone in a detox cell and strapped to a restraint chair. *Est. of Smallwood v. Southern Health Partners, Inc., et al*, No. 9:25-cv-00131, Doc. No. 1 (E.D. Tex. Apr. 29, 2025).

257.    Entity Defendants knowingly set the table for all of the individual defendant's failures, omissions, and deliberately indifferent actions though its widespread and explicit corporate practices. SHP chose to staff LPCJ, and La Plata County chose to permit it, with just one unsupervised nurse at a time. This corporate Defendant's decision, embraced by the County, was made with full awareness and warnings from courts that doing so exposes inmate-patients to obvious dangers of harm and indicates a conscious disregard of their medical needs.

48

258.    Compounding the dangers created by its understaffing and inadequate supervision was Entity Defendants failure to train its Nurses and security staff at LPCJ on: i) the permissible scope of their nursing practice; ii) the obligation to notify the designated provider about patient care needs and developments; iii) the unconstitutional use of untrained jailers by SHP and the County as medical monitors; iv) how to recognize and respond to medical emergencies; v) when to summon emergency medical care; and vi) the need to follow the policies and protocols, as well as statutory and constitutional mandates, that govern their work.

259.    The need for this basic training was obvious, and it was foreseeable that the failure to provide it would cause harm to detainees and inmates in LPCJ. Despite the obvious need for this training and the predictable consequences of not providing it, SHP officials made a conscious decision and deliberate choice not to equip its RNs with basic training on these important job responsibilities. This left LPCJ detainees and inmates without personnel who knew how to identify their medical needs or respond to those needs, putting them at substantial risk.

260.    Mr. Foard fell victim to this lack of training as he deteriorated and repeatedly asked for medical help. Defendant RN Box dismissed his inability to maintain balance and repeated falling down to dehydration, while Defendant RN Snooks dismissed his persistent vomiting and acute 10-out-of-10 abdominal pain as "not appendicitis." Neither Nurse called the Jail's Medical Director as they acted well outside the scope of their licensure and purported to rule out serious causes of Mr. Foard's symptoms. They and the conscripted Deputy "monitors" ignored a genuine medical emergency for an entire day and well into an evening and repeatedly walked by Mr. Foard's cell without responding to it, calling a doctor, or sending him to the hospital.

261.    Federal courts have taken note of training deficiencies at other SHP jails. In *Shadrick*, the court noted that "[t]here is simply no evidence in this record that SHP took any steps to train and supervise its LPN nurses concerning the constitutional dimensions of care in a prison environment." The *Rice* Court too noted the absence of any evidence "that SHP's administrators took responsibility to train its medical staff" in the Montgomery County Jail, and even SHP did not claim to have "any training program at all."  2016 U.S. Dist. LEXIS 59605, at *41-42.

262.    Defendant Nurses have clearly been trained under these unconstitutional dangerous practices.  Asked by CBI investigators if she thought she could have done things differently, Nurse Snooks said that there was nothing different that she could have done in her "treatment" of Mr. Foard.

263.    Nurse Box unrepentantly told CBI investigators that she does not believe she missed anything with Mr. Foard's care and that she would not do anything differently despite Mr. Foard's death on her watch.

### Damages to the Estate of Daniel Foard, Jim Foard, and Susan Gizinski

264.    The Estate of Daniel Foard has suffered significant damages, entitling it to recover compensatory and special damages, including for death, loss of enjoyment of life, loss of relationships, extensive and extreme pain and suffering before death, loss of earnings based upon the probable duration of the victim's life had not the injury occurred, and other damages, all in amounts to be proven at trial.

265.    The Estate is not only entitled to compensatory damages for Daniel Foard's horrific pre-mortem pain and suffering, but also for the loss of his enjoyment and pleasure of living, at the time of his death for his expected 40+ year lifespan.

266. More particularly, the Tenth Circuit has held that compensatory damages include medical and burial expenses, pain and suffering *before* death, loss of earnings based upon the probable duration of the victim's life had not the injury occurred, the victim's loss of consortium, and other damages recognized in common law tort actions.

267. The Estate of Daniel Foard is entitled to compensation for all of his suffering leading up to his death, including agonizing 10/10 stomach pain, lightheadedness, retching, moaning, groaning, grunting inability to maintain balance or walk, abnormal vital signs, labored breathing, sweating, vomiting blood, and repeatedly enduring shocking directions to better aim his vomit into drains while knowing he was dying and begging for help. The final 15-plus hours of his life were dominated by terrible pain and suffering, including his expressed and doubtlessly terrifying consciousness of his impending death.

268. The Estate is also entitled to compensation for his loss of his many loving relationships for the period of his expected life span under standard mortality tables.

269. More particularly, the Estate's loss of consortium damages includes the loss of his relationships with his mother, his father, his brothers, cousins, nephews, and many friends.

270. Daniel Foard, or "Danny" or "Dan" as he was known to family and friends, was a highly skilled young man who while suffering from episodic addiction was, per his family and friends, good at virtually everything he did, a great lover of life, family, music, animals, the outdoors, and had many friends. He lived life in motion, constantly chasing new experiences, pushing his limits, and embracing every ounce of adventure the world had to offer. He was the kind of person who made life feel bigger, brighter, and infinitely more exciting. He was quirky,

funny, effortlessly charming, always coming up with inside jokes and doing whatever he could to make people laugh.

271.    Mr. Foard, as he forthrightly admitted when he went into LPCJ, was struggling with drug issues. He had previously struggled with this addiction as a younger man while still living in Maryland. After moving to Durango in 2018, he was clean for years, but fell back into this habit at some point in late 2022 or early 2023.

272.    Mr. Foard was also naturally gifted and took great pleasure in everything he did; whether it was school, his job, his many hobbies or his relationships, he had a way of excelling effortlessly. Family and friends say that he had a heart of gold. He would do anything for anyone, no matter the ask, no matter the circumstance. He was the first to step up, the last to step away, and always made sure those around him felt supported, loved, and uplifted.

273.    Mr. Foard was fortunate to grow up in a close-knit family helmed by deeply devoted parents. Jim and Susan were both very involved with every part of their son's life from day one. The family shared daily meals, great conversations, games, countless school functions and family vacations together. Susan took several years away from her career as a property manager to be a stay-at-home Mom. She spent precious time with her son, helping him with his school projects, including a middle school book publishing project he did about his Pop-Pop, Susan's father's successful battle with cancer. Mr. Foard was very into sports, and his parents were there for all of it, either in the stands or in Jim's case as a volunteer first base coach for the baseball team. Even after Jim and Susan separated when Mr. Foard was a teenager, and despite his later struggles with drug addiction, Jim and Susan each loved and supported their son throughout. When Mr. Foard moved out to Colorado in 2018 they talked regularly, and he would use his summer vacation time

52

at work to come back home to his Mom, Dad, brothers, cousins, and many friends from growing up. Jim and Susan have been devastated by the loss of their son, whose good natured and free-spirited love of life was a treasure they cannot replace.

274.    Mr. Foard was particularly close with his two brothers Ryan and Kyle, the "three musketeers" as his mother Susan Gizinski describes them. Ryan describes their trio as inseparable. The three brothers spent enormous amounts of time together growing up together in Maryland on 30 acres of land where Jim had built the family home. The boys (Kyle left, Danny center, Ryan right) spent many of their days together outside, listening to music, playing music, dirt biking, working on cars, and playing disc golf. The three are pictured below during a trip home in 2022:



275.    Mr. Foard was also very passionate about music and a natural talent on the guitar. His older brother Ryan, who was drummer in a band in high school, explains that Danny would follow him to band practice with, at first, a toy guitar and sit there for hours learning the basics. The toy guitar was very soon replaced by a real guitar, but Danny continued to soak up all the musical lessons he could from his brother Ryan. He was always eager to learn new tunes and could

learn to play anything just by hearing it. Music for Mr. Foard was not just about the notes – it was about feeling and connection with people, about making every song come alive and making everyone happy in a way that only he could. Mr. Foard is pictured below playing guitar at his brother Ryan's wedding:



276.     Mr. Foard was a great lover of animals. His family and friends explain that he was something of an animal whisperer, that animals seemed to be drawn to Mr. Foard and his warmth and good nature. He is pictured below with dog "Mokie," that he and girlfriend Breanne lived with in their Durango apartment:

 

277.    Mr. Foard was a good student, graduating from North Harford High School in Maryland. He was a highly skilled at Computer Aided Design ("CAD") and graduated with a certification from York Technical Institute in York, Pennsylvania. He worked for a few different companies as a CAD draftsman before moving to Colorado, where he worked as a cook at Steamworks, a local brewpub, and rekindled his love for a profession he had first started in as a teenager working summers at Dead Freddie's, a staple of the Ocean City summer tourist scene.

278.    Mr. Foard loved being outside and made the most of all his outdoor opportunities at the family spread in Maryland and in Durango after his move there in 2018. He enjoyed snowboarding, hiking, skateboarding, disc golf, and fishing. When his younger brother Kyle came out to visit, he joined Mr. Foard on all these adventures, trips that Kyle remembers clearly and very fondly. Kyle has become an avid disc golfer in his own right, to this day, because of his brother's enthusiasm for the sport and for sharing it.

279.    Above all Mr. Foard loved people, and helping people whenever he could. His brother Ryan recalls a difficult time in his own life when he would call up his younger brother to get help and advice. Danny would drop anything he was doing, instantly, even a dinner date with his girlfriend Bre, to talk to his brother for hours.

280.    Mr. Foard's friends recall a man who thoroughly enjoyed his life and was all laughs and smiles and fun. Long time friend Sean Denbow explains that whenever they would go to the mall together Dan would inevitably meet four or five people who knew him, loved him, and wanted to chat. Dan's effortless charisma would immediately kick in and whatever goal they had in going to the mall in the first place would happily be delayed while Dan caught up with his other friends. Dan Foard never had to try to make friends, as Mr. Denbow explains, they all just loved him for

55

who he naturally was. Mr. Foard and Mr. Denbow are pictured below working together to play the

same guitar, with Mr. Denbow strumming and Mr. Foard fingering notes on the fretboard:



281.    The Estate of Daniel Foard has also suffered economic damages for his lost future

earnings, earning capacity and income in amounts still being ascertained for Mr. Foard's expected

productive working lifetime under mortality tables.

282.    Plaintiff Estate is entitled to attorneys' fees and costs pursuant to 42 U.S.C.§1988,

pre-judgment interest and costs as allowable by federal law.

283.    Plaintiff Estate has also incurred special damages in the form of funeral expenses.

284.    Plaintiff Estate is entitled to punitive damages against all the Individual Defendants

and Defendant SHP, in that these Defendants' actions were taken maliciously, willfully and with

a reckless and wanton disregard of the constitutional rights of Plaintiff.

285.    Plaintiff Estate is further entitled, under the Colorado Constitution, Article 2,

Sections 20 and 25, and C.R.S. § 13-21-131 ("ELEIA"), to general compensatory and punitive

damages for the damages it has incurred because of the Deputy Defendants' aforealleged actions

and inactions, including but not limited to, pain and suffering, loss of life, loss of past and future

earnings, loss of relationships, society and companionship, and all other purely non-economic damages as allowed under all applicable statutes.

286.    Plaintiffs Jim Foard and Susan Gizinski are also individually entitled to recover all compensatory damages awardable under Colorado's wrongful death statute against the SHP-related Defendants.  These Plaintiffs give notice that they may also seek to add a punitive damages remedy on this state law claim after requisite discovery as required under Colorado law.

## V.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of 42 U.S.C. § 1983 – 14th Amendment
### Unconstitutional Medical Care
(Plaintiff Estate Against all Individual Defendants – Nurse Snooks, Nurse Box, Dr. Lopez, Sergeant Clark, Deputy Dodge, Deputy Scales, Sergeant Davis, and Deputy Kellinger)

287.    Plaintiff Estate hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

288.    42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

289.    Daniel Foard was a citizen of the United States and all Defendants to this claim are persons for the purposes of 42 U.S.C. § 1983.

290.    Mr. Foard was a pre-trail detainee.

291.    As a pre-trial detainee, Mr. Foard was protected from deliberate indifference to his known serious medical needs by the Fourteenth Amendment.

292.    There is no qualified immunity for the SHP private actors working in a jail.

293.    Each Individual Defendant to this claim, at all times relevant hereto, was acting under color of state law.

294.    As a result of the allegations contained in this Complaint, Individual SHP Defendants and all Individual County Defendants are liable under 42 U.S.C. § 1983 for the violation of Mr. Foard's rights under the Fourteenth Amendment, by acting with deliberate indifference to his obvious known serious medical needs and disregarding the excessive risks associated with his serious and life-threatening medical condition.

295.    All of the Individual SHP Medical Defendants and Individual County Defendants personally participated in the constitutional deprivations described herein.

296.    The acts or omissions of these Defendants were the legal and proximate cause of Mr. Foard's injuries and his Estate's losses.

297.    As a direct and proximate result of these Defendants' unlawful conduct, Plaintiff Estate has suffered injuries and losses entitling it to recover its compensatory and special damages, including for death, loss of earnings, loss of enjoyment and pleasure, other hedonic damages and for the value of his life, loss of relationships,  pre mortem pain and suffering and and other special damages for Mr. Foard's otherwise expected lifetime as authorized by *Berry v. Muskogee* and progeny, all in amounts to be proven at trial.

298.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C.§1988, prejudgment interest and costs as allowable by federal law.

299.    Plaintiff is also entitled to punitive damages against these Defendants, in that their actions were taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

**SECOND CLAIM FOR RELIEF**
**Violation of 42 U.S.C. § 1983 – 14th Amendment**
**Unconstitutional Policies**
(Plaintiff Estate against Entity Defendants)

300.    Plaintiff Estate hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

301.    42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

302.    Daniel Foard was a citizen of the United States and Defendants to this claim are persons for the purposes of 42 U.S.C. § 1983.

303.    Daniel Foard was a pre-trial detainee.

304.    As a pre-trial detainee, he was protected from deliberate indifference to his known serious medical needs by the Fourteenth Amendment.

305.    As a result of the allegations contained in this Complaint, Defendants are liable under 42 U.S.C. § 1983 for maintaining deliberately indifferent policies, which resulted in the violation of Mr. Foard's Fourteenth Amendment right to adequate medical care and to humane conditions of confinement. This was part of an aggravated pattern and practice of deliberate indifference as alleged in detail herein.

306.    Defendant SHP knew that the aforementioned policies, practices, and customs posed a substantial risk of serious harm to detainees like Mr. Foard, and it was obvious that such harm would occur and had regulary occurred to other inmates. Nevertheless, Defendants failed to

59

take reasonable steps to alleviate those risks of harm. There is an affirmative causal link between the deliberate indifference of the individual health care workers towards Mr. Foard's medical needs and the policies, practices, and customs, described herein. All acts or omissions committed by Defendants were the direct and proximate result of the Estate's damages.[1]

307.    The La Plata County Defendants are directly liable for their own policies, practices and customs, including understaffing the jail, contracting with SHP who they knew was understaffing the medical division, and participating in a system where County workers performed untrained medical monitoring, and failing to respond to obvious medical emergencies.

308.    La Plata County Defendants are also non delegably liable for the constitutional policy violations of SHP.

309.    The unconstitutional acts and omissions of Entity Defendants were moving forces in the unconstitutional acts of the Individual Defendants.

310.    As a direct and proximate result of these Defendants' unlawful conduct, Plaintiff Estate has suffered injuries and losses entitling it to recover its compensatory and special damages, including for death, loss of earnings, loss of enjoyment  and pleasure, other hedonic damages and for the value of his life, loss of relationships, pre-mortem pain and suffering, and and other special

---

[1] Plaintiffs intend to argue that the 10th Circuit case *Smedley v. Corr. Corp. of Am.*, 175 F. App'x 943, 946 (10th Cir. 2005) was wrongly decided and that respondeat superior should apply to private entities in § 1983 actions. *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 795 (7th Cir. 2014) ("For all of these reasons, a new approach may be needed for whether corporations should be insulated from respondeat superior liability under § 1983. Since prisons and prison medical services are increasingly being contracted out to private parties, reducing private employers' incentives to prevent their employees from violating inmates' constitutional rights raises serious concerns. Nothing in the Supreme Court's jurisprudence or the relevant circuit court decisions provides a sufficiently compelling reason to disregard the important policy considerations underpinning the doctrine of respondeat superior. And in a world of increasingly privatized state services, the doctrine could help to protect people from tortious deprivations of their constitutional right.")

damages for Mr. Foard's otherwise expected lifetime, as authorized by *Berry v. Muskogee* and progeny, all in amounts to be proven at trial.

311.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

312.    Plaintiff is also entitled to punitive damages against Defendant SHP, in that its actions were taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

**THIRD CLAIM FOR RELIEF**
**Colo. Rev. Stat. § 13-21-131**
**Cruel and Unusual Punishment and Deprivation of Due Process**
**Violation of Colorado Constitution, Article 2, Sections 20 & 25**
(Plaintiff Estate and Individual Plaintiffs against the Individual County Defendants-Clark, Dodge, Scales, Davis, and Kellinger - in their individual capacity)

313.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

314.    Plaintiff Estate, and Plaintiffs Jim Foard and Susan Gizinski, bring this claim against La Plata County Deputy Defendants, POST certified officers, in their individual capacity under C.R.S. § 13-21-131 ("ELEIA"), as to which these law enforcement Defendants have no qualified immunity, statutory immunity, common law immunity, good faith immunity, or any other immunity.

315.    At all times relevant hereto, Defendants Clark, Dodge, Scales, Davis, and Kellinger were acting under the color of state law in their capacity as POST-certified Deputy Sheriffs, Sergeants, and "peace officers" as defined by Colo. Rev. Stat. § 24-31-901(3).

316.    Mr. Foard had a constitutional right under Article 2, Sections 20 and 25 of the Colorado Constitution, to be free from cruel and unusual punishment and to not be deprived of his

life, liberty or property without due process of law, including the right to receive adequate or objectively reasonable and/or non deliberately indifferent medical care while incarcerated. These provisions in the Colorado Constitution are even more protective of Plaintiffs' civil rights than their federal constitutional analogues.

317.    Individual County Defendants literally watched and listened as Mr. Foard catastrophically deteriorated throughout the day and into the night of August 16th, but they did nothing besides bring him water and tell him to aim his vomit into the drain so they would not have to clean anymore. These Deputies had the authority and constitutional obligation as gatekeepers to Mr. Foard's medical care, to send him to the hospital.

318.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff Estate, and Plaintiffs Jim Foard and Susan Gizinski as individuals, have suffered injuries and losses entitling it to recover its compensatory and special damages, including for death, loss of earnings, loss of enjoyment and pleasure, other hedonic damages and for the value of his life, loss of relationships, pre-mortem pain and suffering, and and other special damages for Mr. Foard's otherwise expected lifetime, all in amounts to be proven at trial.

319.    Plaintiffs are therefore entitled to general and compensatory damages for such pain and suffering and emotional distress, and to special damages in amounts to be ascertained at trial, and to punitive damages against these Defendants.

### FOURTH CLAIM FOR RELIEF
**(Negligence resulting in Wrongful Death and Estate Survival Damages)**
(Plaintiffs Jim Foard and Susan Gizinski against Defendants
Snooks, Box, Lopez and SHP)

320.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

321.    Defendant SHP is a private corporation that contracts with La Plata County to provide medical care and health services to detainees and inmates at the La Plata County Jail.

322.    Defendants SHP and its workers are private 'persons', not governmental actors, and are therefore not entitled to any immunity under the Colorado Government Immunity Act.

323.    SHP is vicariously liable for the negligent acts and omissions by their agents and/or employees.

324.    At all times relevant hereto, Defendant SHP and its medical care workers had a duty to provide care to detainees and inmates at LPCJ, including Mr. Foard.

325.    At all times relevant hereto, Defendants had a nurse-patient or doctor-patient relationship with Mr. Foard and were acting within the scope of their employment.

326.    With respect to their care and treatment of Mr. Foard, SHP employees and/or workers owed him a duty to exercise the degree of care, skill, caution, diligence, and foresight exercised by and expected of medical personnel in similar situations. Through their actions and omissions, these Defendants breached their respective standards of care and were negligent in failing to properly assess, monitor, treat, and care for Mr. Foard.

327.    These duties of care are informed by state law. Under C.R.S. § 16-3-401, "prisoners arrests or in custody shall be treated humanely and provided with adequate food, shelter, and, if required, medical treatment." The provision of adequate medical treatment and humane care is a statutory obligation.

328.    In addition to its vicarious liability, Defendant SHP also had a direct duty to implement reasonable policies and exercise reasonable care in the provision of medical care, and in the training and supervision of medical workers at LPCJ. SHP breached its duty to exercise

63

reasonable care in these regards, in the detailed allegations related to entity liability, and in failing to provide reasonable medical care and treatment to inmates, including, Daniel Foard.

329.    As a direct and proximate result of these Defendants' unlawful acts and omissions, Plaintiffs Jim Foard and Susan Gizinski have suffered economic and non-economic damages, losses and injuries in an amount to be determined by the jury at trial. These include, *inter alia*, damages for funeral expenses, grief, pain and suffering, upset, loss of their son's companionship, impairment in the quality of their lives, anger, suffering, emotional distress, and all other damages as allowed under state law. Plaintiffs hereto are therefore entitled to general and compensatory damages for such pain and suffering and emotional distress and to special damages.

330.    Although not required, Plaintiffs hereby give notice that they may seek to amend the Complaint to add punitive damages against these Defendants after substantial discovery as provided by Colorado law.

## VI.    **PRAYER FOR RELIEF**

Plaintiffs pray that this Court enter judgment for the Plaintiffs and against each of the Defendants on the stated claims and enter the following relief:

(a)    All available compensatory damages, including, but not limited to, all available damages for pain and suffering, physical, mental, and emotional distress, hedonic damages to the Estate, and all other economic and non-economic damages available to the Estate and to the individual Plaintiffs under the applicable federal and state laws;

(b)    Punitive damages on all claims as allowed by law on the federal and state civil rights claims against the Individual Defendants and Defendant SHP;

(c)    Attorneys' fees and costs pursuant to 42 U.S.C.§1988, and as allowable by state civil rights law;

(d)    Pre- and post-judgment interest as appropriate; and

(e)    Any further relief at law or equity that this Court deems just and proper.

**PLAINTIFFS RESPECTFULLY REQUEST TRIAL BY JURY.**

Respectfully submitted this 21st day of July 2025.

*/s/ Dan Weiss*
Dan Weiss
Anna Holland Edwards
John Holland
Erica Grossman
Holland, Holland Edwards & Grossman, LLC
1437 High Street
Denver, CO 80218
Phone: (303) 860-1331
dan@hheglaw.com

## CERTIFICATE OF REVIEW

This is to certify that undersigned counsel has conferred, pursuant to Colorado statutes, with a person who has expertise in the areas of this lawsuit's alleged substandard nursing and health care negligence, and this person has reviewed the known facts, including such records, documents, and other materials as found to be relevant to the complaint allegations of substandard acts and omissions, and has concluded that the filing of this complaint does not lack substantial justification, and in fact is substantially meritorious within the meaning of C.R.S. Section 13-20-602, with violations of the standards of care involved by the nursing and healthcare related defendants.

*/s/ Dan Weiss*
Dan Weiss

65